SEALED FILED
MAY 21 2018
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

1272 E Almendra Avenue, Fresno, California 93725, 3515 W Dakota Avenue, Unit #4133, Fresno, California 93722 & 2687 S. Marks Avenue, Fresno, California 93706

Case No. **1: 18 SW 00200 SKO**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachments A-1, A-2, and A-3, attached hereto and incorporated herein.

located in the _____Eastern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B, attached hereto and incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. sections 846, 841(a)(1) | Conspiracy to Distribute and Possession With Intent to Distribute Controlled Substances |

The application is based on these facts:
See Affidavit of DEA Task Force Agent Dean Cardinale, attached hereto and incorporated herein.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**Dean Cardinale, DEA Task Force Officer**
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **May 17, 2018**

City and state: Fresno, California

_____
*Judge's signature*

**Hon. Sheila K. Oberto, U.S. Magistrate Judge**
*Printed name and title*

## AFFIDAVIT OF TFO DEAN CARDINALE

I, Dean Cardinale, Task Force Officer, Drug Enforcement Administration, United States Department of Justice, being duly sworn, do depose and state:

## I.    **INTRODUCTION**

1.    This affidavit is in support of a search and seizure warrant for 1272 E. Almendra Avenue Fresno, California 93710 (**SUBJECT PREMISES 1**), 3515 W. Dakota Avenue, Unit #4133, Fresno, California 93722 (**SUBJECT PREMISES 2**) and 2687 S Marks Avenue, Fresno, California 93706 (**SUBJECT PREMISES 3**). These locations are collectively referred to for the purposes of this affidavit as **THE SUBJECT PREMISES**. This affidavit and application is in support of providing probable cause for the search of **THE SUBJECT PREMISES** for evidence of violations of Title 21, United States Code, Sections 846, 841(a)(1), conspiracy to distribute and possess with intent to distribute cocaine and marijuana and distribution and possession with intent to distribute, cocaine and marijuana, further described in Attachment B, which is attached hereto and incorporated by reference. **THE SUBJECT PREMISES** are described more fully in Attachments A-1 through A-3, which are also attached hereto and incorporated by reference.

### Affiant's Background

2.    I am a deputized Task Force Officer (TFO) with the U.S. Drug Enforcement Administration (DEA), assigned to the Fresno Area Surveillance Team (FAST), and have been so since November 2015. I am also a police officer with the Fresno Police Department for the past 20 years. During that time, I was assigned to the Fresno Police department major narcotics team for 9 years. I graduated from the Fresno City Basic Police Academy in May 1989. I also have an advanced certificate issued by the CA Commission on Peace Officer Standardized Training. I am also an Instructor for the CA Commission on Peace Officer Standardized Training (POST) and have been since November 2010. I specialize and teach new Detectives in the area of search warrant writing, undercover techniques and informant management. I have also testified as an expert in both State and Federal court for possession and possession for sales of a controlled substance. I have received several awards from the Drug Enforcement Administration for the outstanding contribution in the field of Drug Law Enforcement.

Based on my experience and training I have become knowledgeable regarding tactics employed by drug traffickers to manufacture, transport, distribute and conceal illegal drugs. I am certified by the California State Attorneys General's Office in the practical, technical, and legal aspects of court ordered wiretaps (Penal Code Section 629.50 et seq) and am thus familiar with the interception of telephone communication.

3.      In addition, I have completed various training provided by the DEA and local law enforcement agencies, including, but not limited to training on identifying characteristics associated with the manufacture, sale, and transportation of various narcotics, including, but not limited to phencyclidine (PCP), methamphetamine, heroin, cocaine, and marijuana. This training involved the use, possession, packaging, sale, concealment, manufacturing, and transportation of various controlled substances as well as its precursors and chemicals used in the manufacturing process. I am familiar with narcotics traffickers' methods of operation including the distribution, storage, manufacturing, and transportation of narcotics and the collection of money proceeds of narcotics trafficking. I have assisted on the execution of several federal and state narcotics search warrants that resulted in the arrest of suspects and seizure of narcotics.

4.      I have participated in narcotics investigations either as a case agent or in a supporting role. I have debriefed defendants, informants, and witnesses who had personal knowledge regarding narcotics trafficking organizations. Additionally, I have participated in many aspects of drug investigations including, but not limited to, undercover operations, conducting physical and electronic surveillance, and arrests. I have conducted and been involved in numerous investigations regarding the unlawful manufacture, possession, distribution, and transportation of controlled substances, as well as conspiracies associated with criminal narcotics, in violation of Title 21, United States Code, §§ 841(a)(1), 841(c)(2), 843, and 846.

5.      During previous investigations, I have monitored, conducted wire room supervision, and conducted surveillance on previous Federal wire intercepts. During these previous investigations, I have had the opportunity to monitor, listen to, review transcripts or "line sheets" or monitor logs prepared by linguists and/or otherwise discussed with linguist the content of intercepted drug related conversations. Most of these intercepted communications contained coded language used by the participants to cloak

AFFIDAVIT                                                    2

their intentions and thwart law enforcement.  During these investigations, I have obtained information

from other law enforcement officers who are familiar with intercepted coded language as well as

confidential sources and defendants who were intercepted and/or arrested during wire intercept

investigation.  Information from these sources has confirmed my understanding of intercepted coded

language.

6.      I have personally participated in the investigation set forth below.  I am familiar with the

facts and circumstances of the investigation through my personal participation; from discussions with

other agents of the DEA, IRS, the Fresno Police Department (FPD) and other law enforcement agencies;

and from my review of records and reports relating to the investigation.  Unless otherwise noted,

wherever in this affidavit I assert that a statement was made, the information was provided by another

DEA or law enforcement agent, law enforcement officer or witness who may have had either direct or

hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read

and reviewed.  Such statements are among many statements made by others and are stated in substance

and in part unless otherwise indicated.  Since this affidavit is being submitted for the limited purpose of

securing an order authorizing the acquisition of the Requested Information, I have not included details or

facts of every aspect of the investigation.  Facts not set forth herein, or in the attached exhibits, are not

being relied on in reaching my conclusion that the requested order should be issued.  Nor do I request

that this Court rely on any facts not set forth herein in reviewing this application and affidavit.

7.      I know based on my training and experience and from conversations I have had with

other narcotics investigators, specifically in regards to crystal methamphetamine and residences used by

crystal methamphetamine distributors, that items of evidentiary value besides crystal methamphetamine,

are often found at these locations.  These items include, but are not limited to ledgers, journals, receipts,

phone records, rental agreements or leases for vehicles or real property, vehicle registrations, grant

deeds, photographs of potential co-conspirators, or other narcotics storage, letters and other items

associated with personal correspondence that can contain handwritten statements indicating amounts of

money. I also know that these locations will often contain ledgers of drug sales as well as other

commodities such as gold, jewelry and/or foreign currency that can be used as bartering elements or

proceeds from a previous crystal methamphetamine sale.  I also know that these locations will often

1  contain items in order to allow the crystal methamphetamine distributors to protect their investment

2  from other narcotics distributors, home invaders or law enforcement such as firearms, silencers or other

3  dangerous weapons as well as security cameras, recording equipment, police scanners and other types of

4  counter-intrusion, security or law enforcement detection equipment.  I also know that crystal

5  methamphetamine distributors will often contain cell phones, hardline telephones, radios and other

6  communication equipment that is used by the drug traffickers to communicate with customers, sources

7  of supply, workers, water companies or other entities and/or co-conspirators involved in the cultivation

8  operation.

9      8.      Based on my training and experience and the facts set forth in this affidavit, there is

10  probable cause to believe that violations of Title 21, United States Code, Section 841(a)(1) and 846,

11  distribution of a controlled substance, specifically cocaine and marijuana, and conspiracy to distribute,

12  and possess with intent to distribute cocaine and marijuana, is being committed by Alberto PEDRAZA.

13  There is also probable cause to believe that a search of the premises described in Attachment A-1, A-2

14  and A-3 will yield evidence of these crimes and contraband or fruits of these crimes, as described in

15  Attachment B.

16              **II.      SUMMARY OF INVESTIGATION**

17      9.      On March 18, 2018, Federal District Court Judge Dale A. Drozd signed an order

18  authorizing the initial interception of telephone number (559) 708-0336 (Target Telephone1, TT1),

19  utilized by Brandon HOPKINS, whom agents identified as a distributor of methamphetamine, cocaine

20  and marijuana. The interceptions began on March 19, 2018, and were terminated on April 2, 2018[1].

21      10.     On March 20, 2018, at 11:18 AM, HOPKINS received an incoming call from Alberto

22  PEDRAZA utilizing telephone number (559)345-3592 (Target Telephone 3 or TT3). During the call,

23  PEDRAZA asked HOPKINS if HOPKINS still wanted to move those three "shapes". HOPKINS said

24  HOPKINS had someone who wanted to check them out and PEDRAZA said it would have to be

25  tomorrow because PEDRAZA had already left the spot. PEDRAZA then asked HOPKINS if HOPKINS

26

27      [1] Interceptions on TT1 were terminated before the 30 days because of inactivity and the identification of
a new telephone number utilized by HOPKINS. HOPKINS is currently in federal custody and is pending
28  court proceedings.

1  knew where to get "Lactose". HOPKINS asked for the white one and PEDRAZA said "no for the other

2  one, brown one". HOPKINS ultimately said HOPKINS knew where to get it and would call PEDRAZA

3  later.

4      11.     Based on my training and experience, conversations with other experienced narcotics

5  investigators and knowledge of this investigation, I believe that when PEDRAZA asked HOPKINS if

6  HOPKINS still wanted to move the "three shapes", PEDRAZA was asking HOPKINS if HOPKINS was

7  still interested in "three" units of narcotics. I believe when PEDRAZA asked HOPKINS if HOPKINS

8  knew where to get Lactose, PEDRAZA was asking HOPKINS if HOPKINS knew where to obtain a

9  cutting agent. I believe that when HOPKINS asked PEDRAZA if it was for the white, HOPKINS was

10  asking PEDRAZA if it was cocaine. I know the term white is commonly used when referencing cocaine

11  because cocaine is white in color. I believe when PEDRAZA told HOPKINS that the lactose was for

12  "the brown", PEDRAZA was informing HOPKINS that the lactose was going to be used as a cutting

13  agent for heroin. I know that the term "brown" is commonly used to refer to heroin because heroin is

14  typically brown colored. I also know that lactose is commonly used as a cutting agent for cocaine and

15  heroin.

16      12.     On March 29, 2018, Federal District Court Judge Anthony W. Ishii signed an order

17  authorizing the initial interception of telephone number (559)345-3592, Target Telephone 3, TT3,

18  utilized by Alberto PEDRAZA During the interception of TT3, agents intercepted multiple calls related

19  to narcotics trafficking. For example, on March 30, 2018, PEDRAZA received a text message from

20  Johnny CHANG, which read "I have 5 og kush that you like you need it". PEDRAZA responded, "Ok

21  good I will need them". Based on my training and experience, I know that "OG Kush" is a nickname for

22  a strand of marijuana. On April 14, 2018, PEDRAZA placed an outgoing call to Jose Gustavo

23  MARTINEZ, who was also the target of a wiretap in this investigation. During the call, PEDRAZA told

24  MARTINEZ that an unknown third party did not want the "dust "because a third party could not get rid

25  of the "powder." MARTINEZ agreed to exchange the "powder" for bigger ones. Based on my training

26  and experience, I know that the words "dust" and "powder" are commonly used to refer to cocaine.

27  Shortly after this call, agents observed PEDRAZA meet with MARTINEZ and conducted a traffic stop

28  of PEDRAZA.  During the stop, agents located approximately 299 grams of cocaine in PEDRAZA's

1   vehicle.

2                              **SUBJECT PREMISES 1**

3   **1272 E Almendra Avenue, Fresno, California – Location where narcotics were stored and**

4                    **residence of narcotics distributor Alberto PEDRAZA.**

5           13.     1272 E. Almendra Avenue, Fresno, California (**SUBJECT PREMISES 1**) is believed to

6   be the residence of Alberto PEDRAZA. PEDRAZA has been identified as a distributor of cocaine and

7   marijuana, as described above. On April 5, 2018, investigators observed PEDRAZA and another co-

8   conspirator, Daniel SALAZAR, ship two parcels destined for North Carolina. Investigators seized the

9   parcels, which contained approximately 10lbs of processes marijuana buds. On April 24, 2018, during a

10  traffic stop, PEDRAZA was found in possession of approximately 299.2 grams of cocaine, as described

11  above.

12          14.     On April 1, 2018, TFO Frank Perez was monitoring precise location results for TT3,

13  utilized by Alberto PEDRAZA. According to AT&T, TT3 was located within 960 meters of **SUBJECT**

14  **PREMISES 1** for the majority of the night on March 31, 2018 to include the morning of April 1, 2018.

15          15.     On April 1, 2018, at approximately 10:00 AM, I drove to **SUBJECT PREMISES 1** and

16  observed a white colored 2013 Nissan van with a ladder on the roof, bearing California license plate

17  68945H2, registered to Alberto Ramirez at 24716 Melba Drive, Madera, California. According to public

18  records located in the CLEAR database, **SUBJECT PREMISES 1** and 24716 Melba Drive, Madera are

19  both associated with Alberto PEDRAZA.  According to precise location results for TT3, TT3 was at or

20  near the vicinity of SUBJECT PREMISES 1 for the majority of the nights through the monitoring

21  period.

22          16.     On April 4, 2018, Detectives from the Fresno Police Department Special Investigations

23  Bureau (SIB) assigned to the Major Narcotics Unit conducted surveillance of PEDRAZA. At 3:46 PM,

24  PEDRAZA (TT4) received an incoming call from Otilia Avila (OTILIA) utilizing telephone number

25  (559) 970-9672. During the call, PEDRAZA told OTILIA that PEDRAZA had to drive to Dinuba

26  because PEDRAZA had to go get "those packages." PEDRAZA told OTILIA that only "one" (believed

27  to be store) that had "them" (believed to be food saver bags) was the Dinuba (believed to be Wal-Mart).

28  OTILIA told PEDRAZA that they (believed to be food saver bags) were in the kitchen. PEDRAZA told

1  OTILA that PEDRAZA had just arrived at OTILIA's residence.  Based on my training and experience,
2  I believe OTILIA and PEDRAZA were discussing packaging for narcotics.

3    17.    At approximately 4:00 PM, Major Narcotics Detectives established surveillance at
4  OTILIA's residence, 2737 East Overholser Avenue, Fresno, California. At approximately 4:30 PM,
5  Detective Pierce observed PEDRAZA standing outside the front yard of AVILA's residence wearing
6  blue jeans and a gray shirt. Detective Pierce also observed a white colored Nissan utility van parked in
7  the driveway of the residence displaying California license plate 68945H2, which is the same van
8  observed on April 1, 2018 at **SUBJECT PREMISES 1**.

9    18.    At approximately 5:57 PM, Detective Pierce observed PEDRAZA enter the Nissan van
10  and depart the residence. Detectives followed PEDRAZA continuously as PEDRAZA drove to the Wal-
11  Mart Store located at 770 West El Monte Way, Dinuba, California.

12    19.    At 6:14 PM, PEDRAZA (TT4) placed an outgoing call to OTILIA. During the call,
13  PEDRAZA informed OTILIA that the bags were not the right type. OTILIA told PEDRAZA that
14  OTILIA would return them to Wal-Mart. At approximately 6:27 PM, Detective Esquibel observed
15  PEDRAZA arrive and park in the Wal-Mart parking lot. Detective Esquibel observed PEDRAZA exit
16  the Nissan and enter the Wal-Mart.

17    20.    At approximately 6:34 PM, Detective Pierce followed PEDRAZA into the Wal-Mart and
18  observed PEDRAZA purchase four Food Saver vacuum seal rolls. Detective Esquibel observed
19  PEDRAZA exit the Wal-Mart with a plastic white bag containing three to four Food Saver vaccum seal
20  rolls boxes and enter the Nissan. At approximately 6:49 PM, Detective Esquibel observed PEDRAZA
21  depart the Wal-Mart. Detectives followed PEDRAZA continuously as PEDRAZA travelled towards
22  Fresno. At approximately 7:32 PM, Detective Esquibel observed PEDRAZA stop and park facing in an
23  eastbound direction along the south curb frontage road of East Bullard Avenue just west of North Bond
24  Street several blocks prior to arriving at **SUBJECT PREMISES 1**.

25    21.    I observed PEDRAZA retrieve the aforementioned plastic bag from the Nissan and walk
26  towards the front door of **SUBJECT PREMISES 1,** but was unable to actually observed PEDRAZA
27  walk in through the front door.

28    22.    Based on my training and experience, I know the aforementioned vacuum seal bags are

1  commonly used by drug traffickers to package narcotics. I have also experienced drug trafficker's use

2  these types of vacuum seal bags to ship narcotics through the mail to mask the odor.

3        23.     On April 4, 2018, from 8:50 PM through 8:53 PM, PEDRAZA (TT4) and telephone

4  number (559)347-4771, utilized by Daniel "Munchie" SALAZAR exchanged multiple text messages. In

5  the exchange, PEDRAZA tells SALAZAR "we have something to do important tomorrow where will

6  you be" and SALAZAR replied that SALAZAR would be at Sonja's house.

7        24.     On April 5, 2018, at approximately 9:45 AM, Detective Pierce observed PEDRAZA

8  arrive at **SUBJECT PREMISES 1** in the aforementioned Nissan van and enter **SUBJECT PREMISES**

9  **1.**

10        25.     At approximately 1:45 PM, PEDRAZA departed **SUBJECT PREMISES 1** in the

11  Nissan van and was followed by investigators. At approximately 2:10 PM, PEDRAZA arrived in front

12  of 4585 East Balch Avenue. Daniel SALAZAR aka "Munchie", exited the residence and entered

13  PEDRAZA's van empty handed. At approximately 2:33 PM, PEDRAZA arrived at and parked at the

14  United States Post Office located at 2601 East Olive Avenue in Fresno, California.  PEDRAZA exited

15  the driver's seat and got into the front passenger seat as SALAZAR exited the vehicle and walked into

16  the post office empty handed.  SALAZAR then exited the post office and returned to the van with some

17  paper objects in his hands, believed to be shipping labels. HSI SA Timothy Kotman observed

18  PEDRAZA doing something in the back area of the van with unknown items. Detective Gardner also

19  noticed clear plastic bags in the back area of PEDRAZA's van.

20        26.     At approximately 2:47 PM, Detective Medeles observed PEDRAZA manipulating white

21  pieces of paper, possibly shipping labels, in the front passenger seat of the vehicle. SALAZAR then

22  retrieved two brown boxes from the van and walked back into the post office as PEDRAZA remained

23  inside the van. Investigators ultimately observed SALAZAR hand the boxes to a post office employee

24  and pay for the shipping cost with cash. SALAZAR exited the post office and re-entered PEDRAZA's

25  van. At approximately 3:05 PM, Postal Inspector Daniel Porter retrieved the two boxes. At

26  approximately 3:30 PM, SA Joshua Copeland and CHP K9 Officer Jose Chavez responded to the post

27  office for the purpose of K9 "Boj" conducting a sniff of the boxes. At approximately 3:37 PM and 3:39

28  PM, K9 "Boj" alerted to the two packages. Agents obtained a federal search warrant (Case #:1:18-SW-

AFFIDAVIT                8

1   149-BAM), searched the parcels and located a total of approximately 10lbs of processed marijuana,

2   which was destined for a residence in North Carolina.

3        27.   Agents maintained surveillance of PEDRAZA, SALAZAR and the Nissan van after it

4   departed the post office and was eventually followed to **SUBJECT PREMISES 2**, which is detailed

5   below.

6        28.   Based on my training and experience, knowledge of this investigation and the above

7   observations, I believe PEDRAZA utilized **SUBJECT PREMISES 1** to store and package the

8   marijuana that was seized from the parcels.

9        29.   On April 12, 2018, at 10:38 AM, PEDRAZA (TT3) received an incoming call from (559)

10  978-8125, subscribed to "Toni AMEZCUA"[2]. During the call, AMEZCUA told PEDRAZA that

11  PEDRAZA had to "get rid of the room" because "they had found one that's exactly like this one".

12  PEDRAZA asked AMEZCUA if she meant a different place and AMEZCUA responded "yes here in

13  Fresno." AMEZCUA told PEDRAZA that she "didn't want to deal with that." PEDRAZA asked

14  AMEZCUA what did it say and AMEZCUA responded that "everything was bypassed". PEDRAZA

15  told AMEZCUA that "someone probably told on them." PEDRAZA then hung up the phone.

16       30.   At 10:51 AM, PEDRAZA (TT3) received another incoming call from AMEZCUA.

17  During the call, AMEZCUA told PEDRAZA that "it was in the Fresno Bee." PEDRAZA then told

18  AMEZCUA that he was fine with AMEZCUA's concern but she did not "have to bark orders" at him.

19  PEDRAZA then told AMEZCUA that he was not going to remove "it." AMEZCUA again told

20  PEDRAZA that he needed to "get that stuff out of there" and put "everything back to the way it was."

21  PEDRAZA told AMEZCUA he was not and hung up the phone.

22       31.   At 11:30 AM, PEDRAZA (TT3) received an incoming call from AMEZCUA. During the

23  call, PEDRAZA told AMEZCUA that the only thing he saw was a report from Visalia. PEDRAZA went

24  on to compare a past argument he and AMEZCUA had regarding dogs. PEDRAZA then stated, "the

25  plants, those things are the same to me". AMEZCUA stated that she was scared and worried and

26  PEDRAZA stated he understood. PEDRAZA told AMEZCUA that he needed to "finish those and that's

27

28       [2] Agents believe "Toni" is short for Antonio AMEZCUA, which is PEDRAZA's wife.

AFFIDAVIT                                      9

1  about it" and he "wasn't going to put anymore." PEDRAZA and AMEZCUA continued to argue and

2  AMEZCUA stated that she did not think "it" was going to be "on and on," because PEDRAZA initially

3  stated that "it" was only going to be so they could go on vacations, but PEDRAZA "kept on going" and

4  she was getting nervous.

5         32.    Based on my training and experience, knowledge of this investigation and conversations

6  with other experience narcotics investigators, I believe the above conversations between AMEZCUA

7  and PEDRAZA involves an indoor marijuana grow that is located at their residence, **SUBJECT**

8  **PREMISES 1**. I know that individuals who engage in the indoor cultivation of marijuana often

9  "bypass" the electricity to operate the indoor marijuana to avoid detection by law enforcement.

10  Therefore, when AMEZCUA said "everything was bypassed", I believe AMEZCUA was referring to

11  the bypassed electricity in **SUBJECT PREMISES 1**. I believe when PEDRAZA stated "the plants,

12  those things are the same to me", PEDRAZA was referring to how important the marijuana plants were

13  to him. Based on AMEZCUA's statement in regards to "vacations", I believe PEDRAZA is distributing

14  the processed marijuana from the indoor marijuana grow inside **SUBJECT PREMISES 1** for profit. I

15  believe when PEDRAZA said he "had to finish those", PEDRAZA was referring to finishing the

16  cultivation process or "grow cycle" and obtain the processed marijuana.

17  **SUBJECT PREMISES 2**

18  **3515 W. Dakota Avenue, Unit #4133, Fresno, California – Dakota RV & Storage – Location**

19  **believed to be utilized by PEDRAZA as a "stash" location**

20         33.    3515 W Dakota Avenue, Unit #4133, Fresno, is a storage unit utilized by PEDRAZA. On

21  April 3, 2018, at 3:43 PM, during an intercepted call between PEDRAZA and Brandon HOPKINS,

22  PEDRAZA stated that PEDRAZA was "at the storage right now". According to precise location results

23  for TT3, from approximately 3:56 PM through 7:00PM, TT3 was located at or near the Dakota RV &

24  Storage, **SUBJECT PREMISES 2**. On April 5, 2018, agents observed PEDRAZA and SALAZAR

25  spend approximately two hours at the storage unit prior to conducting what agents believe was a

26  narcotics transaction.

27         34.    On April 4, 2018, from 8:35 PM through 8:37 PM, Alberto PEDRAZA (TT3) and

28  telephone number (559)213-4499 (TEXT 4499) exchanged the following text messages:

AFFIDAVIT                 10

TEXT 4499 (8:35 PM):  Can i get one tomorrow

PEDRAZA (8:36 PM): Just the 1 or the 4

TEXT 4499 (8:37 PM): The 4

PEDRAZA (8:37 PM): Ok

TEXT 4499 (8:38 PM): I get out of work around 3 so what evers best for u after that

PEDRAZA (8:44 PM): Ok I'll have it for you tomorrow

TEXT 4499 (8:45 PM): Ok thanks just text me

35.    Based on my training and experience and knowledge of this investigation, I believe the above text message exchange involved TEXT4499 asking PEDRAZA for 4 units of narcotics. As mentioned above, agents conducted surveillance of PEDRAZA on April 5, 2018.

36.    On April 5, 2018, at approximately 3:00 PM, PEDRAZA and SALAZAR departed the post office in the aforementioned Nissan van and were continuously followed by agents.

37.    On April 5, 2018, from 3:24 PM through 4:14 PM, PEDRAZA and TEXT 4499 exchanged the following text messages:

TEXT 4499 (3:24 PM): Im home so just text me whenever

PEDRAZA (4:14 PM): Ok

38.    Agents followed PEDRAZA to Bullard High School, where PEDRAZA's daughter entered the van, then to Boston Market, back to Bullard High School, where PEDRAZA's daughter exited the van. The van was then followed to an Education Employees Credit Union (EECU) in Fresno and then to Garcia's Tire Shop located at 202 "H" Street in Fresno. PEDRAZA exited the Nissan Van and entered a dark blue Chevrolet Silverado display California license plate 4X56206, registered to Domingo Avila at 60 West Parlier Avenue, Fresno, California. PEDRAZA drove the Silverado breifly through side streets and then returned to the tire shop. Investigators observed PEDRAZA and SALAZAR remove several items from the Nissan van and place them in the Silverado. At approximately 5:01 PM, PEDRAZA and SALAZAR departed the tire shop in the Silverado and were followed by investigators.

39.    At approximately 5:15 PM, Fresno County Sheriff's Office (FSO) Sergeant (Sgt) Rich Coningsby observed PEDRAZA and SALAZAR arrive at the Dakota RV and Storage Park located at

3515 W. Dakota, Fresno, California. The Silverado parked in front of Unit #4133, **SUBJECT PREMISES 2**. PEDRAZA and SALAZAR both entered **SUBJECT PREMISES 2**. Sgt Coningsby took aerial photographs of the Silverado's location inside of the storage unit. As a result, agents identified the unit as #4133, **SUBJECT PREMISES 2**. Shortly after, FSO Sgt Coningsby, who was conducting aerial surveillance, departed the area and investigators lost visual of the Silverado.

40.     Agents mistakenly set up a perimeter around Derrel's Mini Storage, which is just north of **SUBJECT PREMISES 2**. As a result, agents did not observe PEDRAZA depart **SUBJECT PREMISES 2** in the Silverado.

41.     From 6:42 PM through 6:45 PM, PEDRAZA and TEXT 4499 exchanged the following text messages:

PEDRAZA (6:42 PM): I'm at the Walmart by your pad

TEXT 4499 (6:43 PM): Can u stop by

PEDRAZA (6:45 PM): Pulling up

42.     According to precise location results for TT3, TT3 was located in the area of Ashlan and Blackstone in Fresno.

43.     At approximately 7:06 PM, HSI Fresno SA Dada Cheam located the Silverado as it entered the 7-Eleven parking lot near the intersection of Ashlan and Blackstone Avenue in Fresno. SA Cheam observed SALAZAR exit the Silverado and make contact with an unknown female. SA Cheam observed PEDRAZA depart the area in the Silverado in an eastbound direction towards Highway 41. Agents lost visual of PEDRAZA in the area of Ashlan and Fresno Street in Fresno. SALAZAR was not followed and surveillance was terminated.

44.     Telephone number (559) 213-4499, TEXT4499, is subscribed to Alice Espinosa at 1924 E Richert Avenue, Fresno, California, which is located approximately .3 miles from the Walmart parking lot.

45.     In my training and experience, narcotics traffickers will frequently minimize the amount of time spent in actual possession of narcotics to reduce their exposure. I am aware of numerous instances, in this investigation and previous investigations, where a trafficker would pick up the

1    narcotics immediately prior to delivery to the customer. As a result, I believe it is unlikely that

2    PEDRAZA was in possession of the narcotics while he was driving to various locations in Fresno, and

3    instead picked the narcotics up immediately before delivering to TEXT 4499.

4         46.    On April 21, 2018, at 10:46 AM, agents intercepted a telephone call between HOPKINS

5    and Jose Gustavo MARTINEZ. At that time, agents were intercepting wire and electronic

6    communications from MARTINEZ's telephone, TT4.[3] During the call, HOPKINS, who was in custody

7    at the Fresno County Jail, told MARTINEZ that HOPKINS had seen HOPKINS' friend "Albert"

8    (PEDRAZA) at the jail[4]. MARTINEZ asked which Albert, and then asked if it was the one that had the

9    "storage" and HOPKINS said yes. Based on my training and experience, I believe that it is unlikely that

10   two known narcotics traffickers would be discussing the "storage" of a third known narcotics trafficker,

11   if the "storage" did not have a nexus to narcotics.

12        47.    Based on my training and experience, knowledge of this investigation, I believe

13   PEDRAZA drove from **SUBJECT PREMISES 2** and delivered the 4 units of narcotics to TEXT4499

14   at the Richert residence, which was near the location of TT3 and PEDRAZA's vehicle.

15        48.    Based on my training and experience I am aware drug traffickers often maintain supplies

16   of controlled substances, firearms, quantities of cash, and other evidence related to drug trafficking at

17   storage units to protect their drug trafficking business from law enforcement detection and seizure. I am

18   aware based on conversations with drug dealers and confidential human sources that drug dealers

19   believe they can conceal this contraband from law enforcement if they use a storage unit. Storage units

20   offer a degree of separation from their residence or other stash locations and are often times difficult for

21   law enforcement to locate. I have personally been involved in investigations were drug dealers have

22   concealed evidence in storage units for this purpose. Oftentimes, drug traffickers keep supplies of

23   controlled substances, firearms, quantities of cash, and other evidence related to drug trafficking at

24        [3] Martinez has been intercepted having numerous narcotics-related telephone calls over TT4.
25   Based on those telephone calls, law enforcement agents have arrested customers of Martinez after
     Martinez made a delivery, and found those customers to be in possession of the same narcotics
26   described in the intercepted telephone calls (including PEDRAZA, see footnote 4).

          [4] On April 14, 2018, PEDRAZA was arrested during a traffic stop which resulted in the seizure
27   of approximately 299.2 grams of cocaine located in PEDRAZA's vehicle. As mentioned above, the
     traffic stop occurred after agents intercepted communications involving a narcotics transaction between
28   MARTINEZ and PEDRAZA and observed PEDRAZA meet with MARTINEZ.

AFFIDAVIT                                    13

1 | storage units for lengthy periods of time because such individuals believe those locations are safe from
2 | the reach of law enforcement.

3 | **SUBJECT PREMISES 3**

4 | **2687 S. Marks Avenue, Fresno, California–Location believed to be the residence of Johnny**

5 | **Blong CHANG that is being utilized by CHANG and PEDRAZA to cultivate marijuana**

6 |

7 | 49.     2687 S. Marks Avenue, Fresno, California (hereinafter, **SUBJECT PREMISES 3**) is

8 | believed to be the residence of Johnny Blong CHANG. Agents believe **SUBJECT PREMISES 3** is

9 | being used to cultivate marijuana. Throughout the course of the investigation, agents intercepted

10 | multiple communications between CHANG and PEDRAZA involving the cultivation of marijuana and

11 | the distribution of marijuana. Agents believe CHANG is operating an indoor marijuana grow at

12 | **SUBJECT PREMISES 3** on behalf of PEDRAZA.

13 | 50.     On April 1, 2018, from 1:05 PM to 4:16 PM, PEDRAZA (TT3) and telephone number

14 | (559)281-5328, utilized by Johnny Blong CHANG, exchanged the following text messages:

15 | CHANG (1:05 PM):  you there albert

16 | PEDRAZA (2:04 PM): Yeah but I can't go by today, I'm with the family

17 | CHANG (2:43 PM): Swing by tomorrow need to put these baby in the ground

18 | PEDRAZA (2:44 PM): Yes I will send me a pic

19 | CHANG (3:32 PM): You want me send you pic

20 | PEDRAZA (3:33 PM): Yes

21 | CHANG (4:13 PM): See it?

22 | PEDRAZA (4:16 PM): Yes they look real nice do they have any balls coming out yet[5]

23 | 51.     Based on my training and experience and knowledge of this investigation, I believe the

24 | above text messages involving CHANG telling PEDRAZA to go to CHANG's residence, **SUBJECT**

25 | 

---

[5] Agents did not intercept the photograph that was mentioned because PEDRAZA mentioned it
26 | was sent through an "App". In my training and experience, I believe "App" refers to a software
application likely installed on PEDRAZA's cellular telephone. I know that narcotics traffickers
27 | frequently use software applications to communicate amongst themselves because they believe it
provides an additional layer of security and because some applications are encrypted in a way that
28 | makes it difficult for law enforcement officers to obtain.

AFFIDAVIT                                        14

1 **PREMISES 3** because it was time to plant the marijuana plants. I believe when CHANG said "we need

2 to put these baby in the ground", CHANG is referring to planting marijuana plants.

3    52.    On April 2, 2018, at 12:40 PM, PEDRAZA (TT3) received an incoming call from

4 CHANG. During the call, PEDRAZA told CHANG that PEDRAZA would come by later and would call

5 CHANG when PEDRAZA was on the way.

6    53.    From 2:46 PM through 3:05 PM, PEDRAZA (TT3) and CHANG exchanged the

7 following text messages:

8    PEDRAZA (2:46 PM): Are you home

9    CHANG (2:47 PM): Yes sir

10    PEDRAZA (2:47 PM): Ok on my way

11    PEDRAZA (3:05 PM): I'm here

12    54.    At approximately 3:30 PM, HSI Fresno SA Varela and DEA SA Copeland drove past

13 **SUBJECT PREMISES 3** and observed PEDRAZA's white Nissan van parked at the residence along

14 with a white colored Toyota Siena minivan. Agents were unable to determine the license plate of the

15 Siena. SA Varela also observed two males at the rear of the property but was unable to identify any of

16 the males.

17    55.    On April 8, 2018, at 6:18 PM, PEDRAZA (TT3) placed an outgoing call to CHANG.

18 During the call, PEDRAZA said PEDRAZA saw "them" and that they are good. CHANG acknowledged

19 and PEDRAZA told CHANG to watch them real closely every day because they are going to start

20 coming out a lot. PEDRAZA then told CHANG to "clip it real clean towards the bottom and that's it."

21 CHANG acknowledged.

22    56.    Based on my training and experience and knowledge of this investigation, I believe the

23 above conversation involved PEDRAZA instructing CHANG on how to care for the marijuana plants

24 that were planted at **SUBJECT PREMISES 3**. I know that when PEDRAZA told CHANG to "clip it

25 real clean towards the bottom", PEDRAZA was referring to clipping the marijuana plants.

26    57.    On April 12, 2018, at 5:50 PM, PEDRAZA (TT3) placed an outgoing call to CHANG.

27 During a portion of the call, PEDRAZA informed CHANG that PEDRAZA lost "10 of them" and could

28 give CHANG the money for that guy. Later in the conversation, CHANG asked PEDRAZA if the "5

AFFIDAVIT                    15

1  didn't get there" and PEDRAZA responded that he (PEDRAZA) had lost 10 and that you win some, you

2  lose some and PEDRAZA had to do something different. PEDRAZA then asked CHANG for a couple

3  of days to get the money together for "those lost ones" and CHANG agreed. PEDRAZA asked CHANG

4  how things were over there and CHANG asked PEDRAZA if it was time to start flowering. CHANG

5  later stated that CHANG had put fertilizer on it but it was still slow. PEDRAZA asked CHANG how the

6  weather was and CHANG said it was blowing cold.

7      58.    Based on my training and experience and knowledge of this investigation, I believe the

8  above conversation between PEDRAZA and CHANG was about the 10 lbs of processed marijuana that

9  investigators seized from PEDRAZA and SALAZAR on April 6, 2018 mentioned above. I believe when

10  PEDRAZA asked CHANG how things were over there and how the weather was, PEDRAZA was

11  asking about the indoor marijuana grow at **SUBJECT PREMISES 3**.

12      59.    A California Department of Motor Vehicles (DMV) records search for CHANG revealed

13  that CHANG's address of record with the DMV is **SUBJECT PREMISES 3**.

14      60.    Based on the above information, intercepted communications, surveillance observations

15  and knowledge of the investigation, I believe CHANG resides at **SUBECT PREMISES 3** and

16  SUBJECT PREMISES 3 is being utilized by CHANG and PEDRAZA to cultivate marijuana.

17      61.    In my training and experience, drug distributors often utilize vehicles in which to

18  transport and distribute controlled substances and/or analogues to facilitate their distributing activities.

19  Based on my training, background, experience, conversations with other law enforcement officers, and

20  the knowledge I have gained through this investigation, I also know that distributors will also utilize

21  vehicles as locations in which to store controlled substances and/or analogues prior to distribution.

22      62.    In my training and experience, individuals involved in manufacturing and/or distributing

23  controlled substances will often conceal, store and transport controlled substances or materials used to

24  manufacture controlled substances and/or analogues in vehicles under their control. Often times,

25  therefore, such individuals will have several vehicles located on their premises. Some of these vehicles

26  are often in various states of repair, ranging from total abandonment and non-drivable to brand new.

27  When checking with the Department of Motor Vehicles, agents and law enforcement officers will often

28  find that such vehicles are registered in the name of other individuals. This is often the result of such

1  individual's attempts to insulate themselves should the vehicles be found containing drugs or other

2  contraband.  Based on my training, background, experience, conversations with other law enforcement

3  officers, and the knowledge I have gained through this investigation, I believe that searching vehicles

4  present at the residences or places of business of such individuals and found to be under their control (as

5  evidenced by possession of keys or paperwork indicating they have access to the vehicle) during the

6  service of the search warrant may produce relevant evidence.  Likewise, as the individuals identified

7  above appear to work primarily from home and are required to utilize their vehicles in order to travel to

8  the various business locations, documents such as business documents, inventory lists, customer lists,

9  sales information, profit information, sales tax information, business/corporate tax information, invoices,

10  shipping labels, receipts, cancelled checks, bank records, supplier lists and other evidence of sales of an

11  ongoing criminal conspiracy, may be found in the vehicles.

12      63.  I know based on my training and experience that cellular telephones are commonly used

13  by drug traffickers to organize the acquisition and distribution of controlled substances, and therefore

14  the information to be found on cellular telephones is useful in identifying and/or verifying the user of the

15  telephone and his/her co-conspirators.  Cellular devices today can serve several functions:  telephones,

16  text messaging, cameras, personal digital assistants, calendars, and address books, mini-computers

17  allowing for electronic mail services, internet services, and rudimentary word processing.

18      a)    The digital, cellular, and/or telephone numbers and/or the direct connect numbers

19      assigned to the device, as well as the device's serial number, allow law enforcement to discover

20      subscriber information as well as other devices that the target device has communicated with

21      which, in turn, would lead to more subscriber information.  The call and direct connect history

22      information can reveal specific information about the phone numbers that the target devices have

23      communicated as well as the time and duration of those calls.  The list of contacts stored on the

24      device potentially names co-conspirators in the crime.

25      b)    Information on the device that does not lead to co-conspirators is still useful in

26      identifying the user of the device (for example, if "Mom" appears in the address book of the

27      phone that contact will likely help identify the user of the phone).

28      c)    Drug traffickers at times use cell phones to take photos, videos, or audio files

AFFIDAVIT                                    17

documenting their drug transactions or the contraband or proceeds. Digital media, such as photos, videos, or audio files, allow law enforcement to potentially discover co-conspirators in the crime or discover types, amounts and prices of drugs trafficked as well as dates, places, and amounts of specific transactions.

d)   Drug traffickers at times use cell phones for financial transactions related to drug trafficking activity. Financial data on cell phones therefore allow law enforcement to potentially discover co-conspirators in the crime or discover prices and dates of specific drug transactions.

e)   Drug traffickers commonly use location services on cell phones to store addresses and navigate routes used in drug trafficking activity, such as addresses of locations where drugs are stored, co-conspirator addresses, and locations of drug deals. Location information on cell phones allows law enforcement to discover information about drug trafficking activity, such as the location of drugs, addresses and dates of drug transactions, and names and addresses of co-conspirators.

f)   Drug traffickers commonly use internet browsers on cell phones to access financial information, communicate with co-conspirators, and facilitate drug trafficking activities. Records of internet activity therefore allow law enforcement to discover information about drug trafficking activity, such as types of drugs, dates of transactions, and names of co-conspirators.

## III.   COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC IMAGE

64.   This application seeks permission to search for and seize evidence and contraband of the crimes described above stored on computers and electronic/digital devices (collectively, "digital devices"), as well as any digital devises that constitute (fruits and) instrumentalities of the crimes.

65.   There are a number of indicators that the above-described target and the proposed location to be searched have computer(s) and/or digital devices.

66.   I have spoken with forensic special agents and others trained in the collection and analysis of computers, servers, removable media, smart phones, email accounts, electronic tablets, pharmacy logs, social media, grand jury 6(e) materials, bank records, shipping records, seized

AFFIDAVIT                                            18

1 documents, drug ledgers, patient files, mail covers, and prison letters. Such agents/contractors have

2 been trained to evaluate digital media such as, but not limited to, computers, cellular phones, or storage

3 devices for evidentiary content, and to retrieve the content.

4      67.    Based on my training, experience, conversations with other law enforcement officers, and

5 information related to me by agents and others involved in the forensic examination of computers and

6 digital devices, I know that data in digital form can be stored on a variety of systems, storage devices, or

7 media including hard disk drives, floppy disks, compact disks, magnetic tapes, flash drives, and memory

8 chips. Some of these devices can be smaller than a thumbnail and can take several forms, including

9 thumb drives, secure digital media used in phones and cameras, personal music devices, and similar

10 items.

11      68.    Based upon my involvement in the investigation to date, I believe that computer(s) and

12 digital device(s) will be found at the premises.

13      69.    Based upon my training and experience, and information related to me by agents and

14 others involved in the forensic examination of computers and digital devices, I know that computers and

15 digital devices are often used to store information, very much the same way paper, ledgers, files and file

16 cabinets are used to store information. I know that it is common today for businesses to utilize

17 computers to conduct their business and to store information related thereto. I also know that it is

18 common for individuals to have personal computers and to use these computers to conduct their

19 personal affairs, their business affairs, and to store information related thereto. I know based on my

20 training and experience, including prior investigations specifically related to the investigation of the

21 trafficking, manufacture, and sales of controlled substances by businesses, that subjects who are engaged

22 in such conduct commonly store information related to their activities on computers and digital devices.

23      70.    Based upon my training and experience, and information related to me by agents and

24 others involved in the forensic examination of computers and digital devices, I know a forensic image is

25 an exact physical copy of a data storage device. A forensic image captures all data on the subject media

26 without viewing or changing the data in any way. Absent unusual circumstances, it is essential that a

27 forensic image be obtained prior to conducting any search of data for information subject to seizure

28 pursuant to the warrant. I also know that during the search of the premises it is not always possible to

1  create a forensic image of or search digital devices or media for data. I also know that it is frequently

2  necessary to remove digital devices or media for later laboratory evaluation off-site under controlled

3  circumstances. This is true for a number of reasons, including the following:

4  A. Searching digital devices can be a highly technical process that requires specific expertise and

5  specialized equipment. Because there are so many different types of digital devices and software

6  in use today, it is difficult to anticipate all of the necessary technical manuals, specialized

7  equipment, and specific expertise necessary to conduct a thorough search of the media to ensure

8  that the data will be preserved and evaluated in a useful manner.

9  B. Searching digital devices can require the use of precise, scientific procedures designed to

10  maintain the integrity of the evidence. The recovery of such data may require the use of special

11  software and procedures, such as those used in a law enforcement laboratory.

12  C. The volume of data stored on many digital devices is typically so large that it will be highly

13  impractical to search for data during the execution of the physical search of the premises.

14  Storage devices capable of storing 500 gigabytes of data are now commonplace in desktop

15  computers. It can take several hours, or even days, to image a single hard drive. The larger the

16  drive, the longer it takes. Depending upon the number and size of the devices, the length of time

17  that agents must remain onsite to image and examine digital devices can become impractical.

18  D. Since digital data may be vulnerable to inadvertent modification or destruction, a controlled

19  environment, such as a law enforcement laboratory, may be essential to conduct a complete and

20  accurate analysis of the digital devices from which the data will be extracted. Software used in a

21  laboratory setting can often reveal the true nature of data. Moreover, a computer forensic

22  reviewer needs a substantial amount of time to extract and sort through data that is concealed or

23  encrypted to determine whether it is evidence, contraband, or an instrumentality of a crime.

24  E. Analyzing the contents of a computer or other electronic storage device, even without

25  significant technical difficulties, can be very challenging, and a variety of search and analytical

26  methods must be used. For example, searching by keywords, which is a limited text based

27  search, often yields thousands of hits, each of which must be reviewed in its context by the

28  examiner to determine whether the data is within the scope of the warrant. Merely finding a

AFFIDAVIT                                                  20

relevant hit does not end the review process. The computer may have stored information about the data at issue which may not be searchable text, such as: who created it; when and how it was created, downloaded, or copied; when it was last accessed; when it was last modified; when it was last printed; and when it was deleted. The relevance of this kind of data is often contextual. Furthermore, many common email, database, and spreadsheet applications do not store data as searchable text, thereby necessitating additional search procedures. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed data requires a search of events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which users logged in, whether users shared passwords, whether a computer was connected to other computers or networks, and whether the users accessed or used other programs or services in the relevant time period, can help determine who was sitting at the keyboard.

F. Searching digital devices can require the use of precise, scientific procedures designed to recover latent data. The recovery of such data may require the use of special software and procedures. Data that represents electronic files or remnants of such files can be recovered months or even years after it has been downloaded onto a hard drive, deleted, or viewed via the Internet. Even when such files have been deleted, data can be recovered months or years later using readily available forensic tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in space on the hard drive or other storage media that is not allocated to an active file. In addition, a computer's operating system may keep a record of deleted data in a swap or recovery file or in a program specifically designed to restore the computer's settings in the event of a system failure.

71.     This warrant seeks authority to seize contextual data, that is, evidence of how a digital device has been used, what it has been used for and who has used it. It can be very important in criminal cases to seek "attribution" data so that an event or communication can be associated with a person. Based upon my training and experience, and information related to me by agents and others involved in

the forensic examination of computers and digital devices, this authority is sought for a number of reasons:

A. In some instances, the computer "writes" to storage media without the specific knowledge or permission of the user. Generally, data or files that have been received via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to such data or files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve artifacts of electronic activity from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer usage. Logs of access to websites, file management/transfer programs, firewall permissions, and other data assist the examiner and investigators in creating a "picture" of what the computer was doing and how it was being used during the relevant time in question. Given the interrelationships of the data to various parts of the computer's operation, this information cannot be easily segregated.

B. Digital data on the hard drive that is not currently associated with any file may reveal evidence of a file that was once on the hard drive but has since been deleted or edited, or it could reveal a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, email programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations (or on other devices).

C. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be learned from the absence of particular data on a digital device. Specifically,

AFFIDAVIT                                          22

the lack of computer security software, virus protection, malicious software, evidence of remote control by another computer system, or other programs or software may assist in identifying the user indirectly and may provide evidence excluding other causes for the presence or absence of the items sought by this application.  Additionally, since computer drives may store artifacts from the installation of software that is no longer active, evidence of the historical presence of the kind of software and data described may have special significance in establishing timelines of usage, confirming the identification of certain users, establishing a point of reference for usage and, in some cases, assisting in the identification of certain users.  This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations.    Evidence of the absence of particular data on the drive is not generally capable of being segregated from the rest of the data on the drive.

72.    This warrant seeks authority to seize contextual data, that is, evidence of how a digital device has been used, in searching for data capable of being read, stored, or interpreted by a computer or storage device, law enforcement personnel executing the search warrant will employ the following procedure:

A. On site search, if practicable:  Law enforcement officers trained in computer forensics (hereafter "computer personnel"), if present, may be able to determine if digital devices can be searched on site in a reasonable amount of time and without jeopardizing the ability to preserve data on the devices and conduct such a search if deemed practicable.  Any device searched on site will be seized if it contains any data falling within the list of items to be seized as set forth in the warrant and in Attachment B.

B. On site imaging, if practicable:  If a digital device cannot be searched on site as described above, the computer personnel, if present, will determine whether the device can be imaged on site in a reasonable amount of time without jeopardizing the ability to preserve the data and conduct such imaging if deemed practicable.

C. Seizure of digital devices for off-site imaging and search:  If no computer personnel are present at the execution of the search warrant, or if they determine that a digital device cannot be searched or imaged on site in a reasonable amount of time and without jeopardizing the ability to

AFFIDAVIT

23

1   preserve data, the digital device will be seized and transported to an appropriate law enforcement

2   laboratory for review. Any device searched offsite will be seized if it contains any data falling

3   within the list of items to be seized as set forth in the warrant and in Attachment B. If the device

4   does not contain such data, it will be returned to the owner within 90 days.

5   D. Law enforcement personnel (potentially including, but not necessarily limited to, computer

6   personnel) will examine the digital device to determine if it contains any data that falls within

7   the list of items to be seized as set forth in the warrant and in Attachment B.

8   E. Law enforcement personnel will use procedures designed to identify items to be seized under

9   the warrant. These procedures may include, without limitation, the use of a "hash value" library

10   to exclude normal operating system files that do not need to be searched. In addition, law

11   enforcement personnel may search for and attempt to recover deleted, hidden, or encrypted data

12   to determine whether the data falls within the list of items to be seized under the warrant.

13   F. If the original digital device was seized, law enforcement personnel will perform an initial

14   search of the original digital device within a reasonable amount of time. If, after conducting the

15   initial search, law enforcement personnel determine that an original digital device contains any

16   data falling within the list of items to be seized pursuant to this warrant, the government will

17   retain the original digital device to, among other things, litigate the admissibility/authenticity of

18   the seized items at trial, ensure the integrity of the copies, ensure the adequacy of chain of

19   custody, and resolve any issues that potentially might be raised regarding changed conditions of

20   the evidence.

21   G. If an original digital device does not contain any data falling within the list of items to be

22   seized pursuant to this warrant, the government will: return that original digital device to its

23   owner within a ~~reasonable period of time~~ 90 days (SKO) if it can be lawfully possessed; seal any image

24   previously made of the device; and not review the sealed image absent further authorization from

25   the Court.

26       73.      Based upon my training and experience, and information related to me by agents and

27   others involved in the forensic examination of computers and digital devices, I know that, in order to

28   search for data that is capable of being read or interpreted by a computer, law enforcement personnel

1  will need to seize, image, copy, and/or search the following items, subject to the procedures set forth

2  herein:

3      A.  Any computer equipment or digital devices that are capable of being used to commit or

4          further the crimes outlined above, or to create, access, or store (evidence, contraband, fruits, or

5          instrumentalities) of such crimes, as set forth in Attachment B;

6      B.  Any computer equipment or digital devices used to facilitate the transmission, creation,

7          display, encoding, or storage of data, including word processing equipment, modems, docking

8          stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of

9          being used to commit or further the crimes outlined above, or to create, access, process, or store

10         (evidence, contraband, fruits, or instrumentalities) of such crimes, as set forth in Attachment B;

11     C.  Any magnetic, electronic, or optical storage device capable of storing data, such as floppy

12         disks, hard disks, tapes, CD ROMs, CD Rs, CD RWs, DVDs, optical disks, printer or memory

13         buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks,

14         personal digital assistants, and cell phones capable of being used to commit or further the crimes

15         outlined above, or to create, access, or store (evidence, contraband, fruits, or instrumentalities) of

16         such crimes, as set forth in Attachment B;

17     D.  Any documentation, operating logs, and reference manuals regarding the operation of the

18         computer equipment, storage devices, or software;

19     E.  Any applications, utility programs, compilers, interpreters, and other software used to

20         facilitate direct or indirect communication with the computer hardware, storage devices, or data

21         to be searched;

22     F.  Any physical keys, encryption devices, dongles, or similar physical items which are necessary

23         to gain access to the computer equipment, storage devices, or data;

24     G.  Any passwords, password files, test keys, encryption codes, or other information necessary to

25         access the computer equipment, storage devices, or data;

26     H.  All records, documents, programs, applications, or materials created, modified, or stored in

27         any form, including in digital form, on any computer or digital device, that show the actual

28         user(s) of the computers or digital devices during any time period in which the device was used

to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device);

I. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device; and

J. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities described in this attachment.

74.     The government will retain a forensic image of each digital device subjected to analysis for a number of reasons, including proving the authenticity of evidence to be used at trial; responding to any potential questions regarding the corruption of data; establishing the chain of custody of data; refuting any potential claims of fabrication, tampering, or destruction with/of data; and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

75.     With respect to the seizure of electronic storage media or the seizure or imaging of electronically stored information, the search warrant return to the Court will describe the physical storage media that were seized or imaged.

## IV.     REQUEST FOR SEALING

76.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are

1  relevant to an ongoing investigation into the criminal organizations as not all of the targets of this

2  investigation will be searched at this time.  Based upon my training and experience, I have learned that

3  online criminals actively search for criminal affidavits and search warrants via the internet, and

4  disseminate them to other online criminals as they deem appropriate, e.g., by posting them publicly

5  online through the carding forums.  Premature disclosure of the contents of this affidavit and related

6  documents may have a significant and negative impact on the continuing investigation and may severely

7  jeopardize its effectiveness.

8         I swear under penalty of perjury that the foregoing is true.

9     //

10     //

1

2

3                          V.      **CONCLUSION**

4          Based on the foregoing, I respectfully request the court to issue a warrant to search premises

5   described in Attachments A-1 through A-3, and seize the items and information specified in Attachment

6   B to this affidavit and to the Search and Seizure Warrant.

7          Approved as to form:

8

9   /s/ Vincenza Rabenn
    Vincenza Rabenn,
10  Assistant U.S. Attorney

11                                                      Dean Cardinale
                                                        Task Force Officer
12                                                      Drug Enforcement Administration

13  Subscribed and sworn to before
    me this 17th day of September May 2018
14  2017 at Fresno, CA

15

16  Honorable Sheila K. Oberto
    United States Magistrate Judge
17

18

19

20

21

22

23

24

25

26

27

28

## ATTACHMENT A-1

1272 E Almendra Avenue, Fresno, California 93725

1272 E. Almendra Avenue, Fresno, CA, is described as a single family, single story residence located on the north side of E. Almendra Ave.  The residence is light blue in color in color with dark blue trim.  The front door is brown in color which faces south, towards Almendra Avenue.

Also to be searched are all rooms therein, including any safes, storage containers, closets, sheds, and garages associated with the premises. Also to be searched are vehicles directly associated with the residence, i.e. vehicles parked in the driveway or alley behind the residence or vehicles parked near the residence that are believed to be associated with the residence based on documents or property recovered inside the residence.



## ATTACHMENT A-2

3515 W Dakota Avenue, Unit #4133, Fresno, California 93722

3515 W Dakota Avenue, Unit #4133, Fresno, CA is described as storage unit inside of Dakota Park & RV Storage is located on the southwest corner of the intersection of Dakota Avenue and Valentine Avenue in Fresno, California. The main entrance to Dakota Park & RV Storage is off N Valentine Avenue in Fresno, California. Unit #4133 has the numbers "4133" in white writing affixed to a black sign on top of the brown colored door.

Also to be searched are all rooms therein, including any safes, storage containers, closets, sheds, and garages associated with the premises.



## ATTACHMENT A-3

2687 S. Marks Avenue, Fresno, California 93706

2687 S Marks Avenue, Fresno, California is described as a single family, single story residence located on the west side of S. Marks Avenue between W. North Avenue and W. Annandale Avenue. The residence is white in color with a brown composite roof. The front door has a black security screen on it which faces east, towards Marks Avenue. The residence has a driveway protected by a black colored iron gate.

Also to be searched are all rooms therein, including any safes, storage containers, closets, sheds, and garages associated with the premises. Also to be searched are vehicles directly associated with the residence, i.e. vehicles parked in the driveway or alley behind the residence or vehicles parked near the residence that are believed to be associated with the residence based on documents or property recovered inside the residence.



## ATTACHMENT B

### The search is related to a violation of:

Title 21 U.S.C. § 841(a)(1) Distribution or Possession with intent to Distribute a Controlled Substance

### Items to Be Searched for and Seized:

### Drug Distribution Offenses

1.  The following items, images, documents, communications, records, materials, and information are to be seized wherever they may be stored or found at the locations to be searched and in any form that they may be stored or found, associated with the above violations:

    a.  Controlled substances (including prescription drugs);

    b.  United States currency (in excess of $1,000.00), foreign currency, precious metals, jewelry, stocks, bonds, money orders, certificates of deposit and cashier's checks;

    c.  Items evidencing the expenditure of drug-related proceeds, namely: receipts, purchase agreements, vehicle titles, warranty applications, homeowners or renters insurance applications and claims, jewelry;

    d.  Account statements, account summaries, credit card statements, banking deposit slips, handwritten-notes containing account information, account holder and amount deposited, money market accounts, overseas banking information to include routing codes, deposit receipts, canceled checks, loan agreements and loan applications;

    e.  Safe deposit box keys and agreements and commercial storage locker keys or records;

    f.  Drug distribution paraphernalia, namely; scales, baggies, vacuum sealers and vacuum sealer bags, drug ledgers, pay-owe sheets, customer lists,

1

price lists and code sheets,

g.  Devices used to communicate with other individuals involved in distrib-
uting controlled substances including cellular telephones, satellite tele-
phones, mobile telephones; and devices used to conduct counter-
surveillance against law enforcement, such as radio scanners, police radi-
os, surveillance cameras and monitors, anti-bugging devices and devices
used to detect the presence of wiretaps, recording devices or transmitters,
and/or receipts of literature describing the same.  In addition, for agents to
answer the telephones and to record and return the pager telephone num-
bers without identifying themselves as law enforcement officers.

h.  Safes, lock boxes, lockers, or any other secured container which contains
any of the included items referenced in this attachment establishing evi-
dence of a conspiracy or the use, distribution, transportation, ordering,
sale, or receipt of controlled substances.

i.  Items involved in packaging and transporting controlled substances, in-
cluding scales, heat sealing devices, plastic bags, measuring devices, razor
blades, and related paraphernalia.

j.  Firearms, firearms accessories, and other weapons to include bats and
knives, used to protect drug supplies and trafficking proceeds.

**Evidence of Ownership – All Locations**

2.  Items tending to establish the identity of the person in control of the SUBJECT PREMIS-
ES, and any items seized from the SUBJECT PREMISES, to include utility company re-
ceipts, mortgage or rent receipts, canceled  mail, envelopes, keys, telephone bills, charge
card receipts/statements, lease-rental or sale agreements or contracts, gas receipts, note-
books, photographs, videos, savings account passbooks, passports, diaries, notebooks, ve-
hicle registrations and titles, land titles, escrow papers, legal documents, medical records,

2

weapons with serial numbers, and personal clothing including shoes, pants and shirts.

## Electronically Stored Information ("ESI") to Be Searched

1.    For searches of any computers or digital devices found at the properties described in Attachment A, law enforcement agents are authorized to search the following ESI subject to the items described in paragraphs above:

A.    Any computer equipment or digital devices that are capable of being used to commit or further the crimes outlined above, or to create, access, or store evidence, contraband, fruits or instrumentalities of such crime described above.

B.    Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crime described above, or to create, access, process, or store evidence, contraband, fruits or instrumentalities of the crime described above.

C.    Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD ROMs, CD Rs, CD RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes outlined above, or to create, access, or store evidence, contraband, fruits or instrumentalities of the crime described above.

D.    Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software.

E.    Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched.

F.    Any physical keys, encryption devices, dongles, or similar physical items which

3

are necessary to gain access to the computer equipment, storage devices, or data.

G.     Any passwords, password files, test keys, encryption codes, or other infor-mation necessary to access the computer equipment, storage devices, or data.

H.     All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) of the computers or digital devices during any time period in which the device was used to commit the crime referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pag-es; email addresses used from the computer; MAC IDs and/or Internet Protocol ad-dresses used by the computer; email, instant messages, and other electronic communi-cations; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as virus-es, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device).

I.     All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device.

J.     All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities of the crime described above.


**Instructions For Searching and Seizing Items in Electronic Storage**


2.     In searching for data capable of being read, stored, or interpreted by a computer or storage device, law enforcement personnel executing the search warrant will employ the

4

following procedure:

A.    On site search, if practicable.  Law enforcement officers trained in computer forensics (hereafter, "computer personnel"), if present, may be able to determine if digital devices can be searched on site in a reasonable amount of time and without jeopardizing the ability to preserve data on the devices and conduct such a search if deemed practicable.  Any device searched on site will be seized if it contains any data falling within the list of items to be seized as set forth in the warrant and in Attachment B.

B.    On site imaging, if practicable.  If a digital device cannot be searched on site as described above, the computer personnel, if present, will determine whether the device can be imaged on site in a reasonable amount of time without jeopardizing the ability to preserve the data and conduct such imaging if deemed practicable.

C.    Seizure of digital devices for off-site imaging and search.  If no computer personnel are present at the execution of the search warrant, or if they determine that a digital device cannot be searched or imaged on site in a reasonable amount of time and without jeopardizing the ability to preserve data, the digital device will be seized and transported to an appropriate law enforcement laboratory for review.   Any device searched offsite will be seized if it contains any data falling within the list of items to be seized as set forth in the warrant and in Attachment B, if it does not contain such data, it will be returned within 1̶2̶0̶ **90 (SW)** days.

D.    Law enforcement personnel (potentially including, but not necessarily limited to, computer personnel) will examine the digital device to  determine if it contains any data that falls within the list of items to be seized as set forth in the warrant and in Attachment B.

E.    Law enforcement personnel will use procedures designed to identify items to be seized under the warrant.  These procedures may include, without limitation, the use of

a hash value to exclude normal operating system files that do not need to be searched. In addition, law enforcement personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data falls within the list of items to be seized under the warrant.

F.     If an original digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will: return that original digital device to its owner within a ~~reasonable period of time~~ *90 days (SKO)* if it can be lawfully possessed; seal any image previously made of the device; and not review the sealed image absent further authorization from the Court.

SEALED COPY

ISSUED

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| 2687 S. Marks Avenue, Fresno, California 93706 | ) |
| | ) |
| | ) |

T: 1 8 SW  0 0 2 0 0 SKO

Case No.

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3, attached hereto and incorporated herein.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, attached hereto and incorporated herein.

**YOU ARE COMMANDED** to execute this warrant on or before _____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Duty Magistrate_____

*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for ____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____

Date and time issued:   *May 17, 2018 at 4:01 p.m.*         *Sheila K. Oberto*

*Judge's signature*

City and state:     Fresno, California         Hon. Sheila K. Oberto, U.S. Magistrate Judge

*Printed name and title*

## ATTACHMENT A-3

2687 S. Marks Avenue, Fresno, California 93706

2687 S Marks Avenue, Fresno, California is described as a single family, single story residence located on the west side of S. Marks Avenue between W. North Avenue and W. Annandale Avenue. The residence is white in color with a brown composite roof. The front door has a black security screen on it which faces east, towards Marks Avenue. The residence has a driveway protected by a black colored iron gate.

Also to be searched are all rooms therein, including any safes, storage containers, closets, sheds, and garages associated with the premises. Also to be searched are vehicles directly associated with the residence, i.e. vehicles parked in the driveway or alley behind the residence or vehicles parked near the residence that are believed to be associated with the residence based on documents or property recovered inside the residence.



## ATTACHMENT B

### The search is related to a violation of:

Title 21 U.S.C. § 841(a)(1) Distribution or Possession with intent to Distribute a Controlled Substance

### Items to Be Searched for and Seized:

### Drug Distribution Offenses

1.  The following items, images, documents, communications, records, materials, and information are to be seized wherever they may be stored or found at the locations to be searched and in any form that they may be stored or found, associated with the above violations:

    a.  Controlled substances (including prescription drugs);

    b.  United States currency (in excess of $1,000.00), foreign currency, precious metals, jewelry, stocks, bonds, money orders, certificates of deposit and cashier's checks;

    c.  Items evidencing the expenditure of drug-related proceeds, namely: receipts, purchase agreements, vehicle titles, warranty applications, homeowners or renters insurance applications and claims, jewelry;

    d.  Account statements, account summaries, credit card statements, banking deposit slips, handwritten-notes containing account information, account holder and amount deposited, money market accounts, overseas banking information to include routing codes, deposit receipts, canceled checks, loan agreements and loan applications;

    e.  Safe deposit box keys and agreements and commercial storage locker keys or records;

    f.  Drug distribution paraphernalia, namely; scales, baggies, vacuum sealers and vacuum sealer bags, drug ledgers, pay-owe sheets, customer lists,

price lists and code sheets,

g.  Devices used to communicate with other individuals involved in distrib-
uting controlled substances including cellular telephones, satellite tele-
phones, mobile telephones; and devices used to conduct counter-
surveillance against law enforcement, such as radio scanners, police radi-
os, surveillance cameras and monitors, anti-bugging devices and devices
used to detect the presence of wiretaps, recording devices or transmitters,
and/or receipts of literature describing the same.  In addition, for agents to
answer the telephones and to record and return the pager telephone num-
bers without identifying themselves as law enforcement officers.

h.  Safes, lock boxes, lockers, or any other secured container which contains
any of the included items referenced in this attachment establishing evi-
dence of a conspiracy or the use, distribution, transportation, ordering,
sale, or receipt of controlled substances.

i.  Items involved in packaging and transporting controlled substances, in-
cluding scales, heat sealing devices, plastic bags, measuring devices, razor
blades, and related paraphernalia.

j.  Firearms, firearms accessories, and other weapons to include bats and
knives, used to protect drug supplies and trafficking proceeds.

**Evidence of Ownership – All Locations**

2.  Items tending to establish the identity of the person in control of the SUBJECT PREMIS-
ES, and any items seized from the SUBJECT PREMISES, to include utility company re-
ceipts, mortgage or rent receipts, canceled  mail, envelopes, keys, telephone bills, charge
card receipts/statements, lease-rental or sale agreements or contracts, gas receipts, note-
books, photographs, videos, savings account passbooks, passports, diaries, notebooks, ve-
hicle registrations and titles, land titles, escrow papers, legal documents, medical records,

2

weapons with serial numbers, and personal clothing including shoes, pants and shirts.

**Electronically Stored Information ("ESI") to Be Searched**

1.     For searches of any computers or digital devices found at the properties described in Attachment A, law enforcement agents are authorized to search the following ESI subject to the items described in paragraphs above:

A.     Any computer equipment or digital devices that are capable of being used to commit or further the crimes outlined above, or to create, access, or store evidence, contraband, fruits or instrumentalities of such crime described above.

B.     Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crime described above, or to create, access, process, or store evidence, contraband, fruits or instrumentalities of the crime described above.

C.     Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD ROMs, CD Rs, CD RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes outlined above, or to create, access, or store evidence, contraband, fruits or instrumentalities of the crime described above.

D.     Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software.

E.     Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched.

F.     Any physical keys, encryption devices, dongles, or similar physical items which

3

are necessary to gain access to the computer equipment, storage devices, or data.

G.     Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data.

H.     All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) of the computers or digital devices during any time period in which the device was used to commit the crime referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device).

I.     All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device.

J.     All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities of the crime described above.


**Instructions For Searching and Seizing Items in Electronic Storage**

2.     In searching for data capable of being read, stored, or interpreted by a computer or storage device, law enforcement personnel executing the search warrant will employ the

4

following procedure:

A.    On site search, if practicable. Law enforcement officers trained in computer fo-
rensics (hereafter, "computer personnel"), if present, may be able to determine if digi-
tal devices can be searched on site in a reasonable amount of time and without jeop-
ardizing the ability to preserve data on the devices and conduct such a search if
deemed practicable. Any device searched on site will be seized if it contains any data
falling within the list of items to be seized as set forth in the warrant and in Attach-
ment B.

B.    On site imaging, if practicable. If a digital device cannot be searched on site as
described above, the computer personnel, if present, will determine whether the device
can be imaged on site in a reasonable amount of time without jeopardizing the ability
to preserve the data and conduct such imaging if deemed practicable.

C.    Seizure of digital devices for off-site imaging and search. If no computer per-
sonnel are present at the execution of the search warrant, or if they determine that a
digital device cannot be searched or imaged on site in a reasonable amount of time and
without jeopardizing the ability to preserve data, the digital device will be seized and
transported to an appropriate law enforcement laboratory for review. Any device
searched offsite will be seized if it contains any data falling within the list of items to
be seized as set forth in the warrant and in Attachment B, if it does not contain such
data, it will be returned within 120 days.

D.    Law enforcement personnel (potentially including, but not necessarily limited
to, computer personnel) will examine the digital device to determine if it contains any
data that falls within the list of items to be seized as set forth in the warrant and in At-
tachment B.

E.    Law enforcement personnel will use procedures designed to identify items to be
seized under the warrant. These procedures may include, without limitation, the use of

a hash value to exclude normal operating system files that do not need to be searched. In addition, law enforcement personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data falls within the list of items to be seized under the warrant.

F.    If an original digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will: return that original digital device to its owner within a reasonable period of time *60 days* if it can be lawfully possessed; seal any image previously made of the device; and not review the sealed image absent further authorization from the Court.

6

SEALED COPY

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

ISSUED

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.  1: 1 8 SW  0 0 2 0 0 SKO
1272 E Almendra Avenue, Fresno, California 93725 )
)
)

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____Eastern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, attached hereto and incorporated herein.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, attached hereto and incorporated herein.

**YOU ARE COMMANDED** to execute this warrant on or before _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.  ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to _____Duty Magistrate_____
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____

Date and time issued:   *May 17, 2018 at 4:00 p.m.*          *Sheila K. Oberto*
                                                            *Judge's signature*

City and state:    Fresno, California          Hon. Sheila K. Oberto, U.S. Magistrate Judge
                                               *Printed name and title*

**ATTACHMENT A-1**

1272 E Almendra Avenue, Fresno, California 93725

1272 E. Almendra Avenue, Fresno, CA, is described as a single family, single story residence located on the north side of E. Almendra Ave. The residence is light blue in color in color with dark blue trim. The front door is brown in color which faces south, towards Almendra Avenue.

Also to be searched are all rooms therein, including any safes, storage containers, closets, sheds, and garages associated with the premises. Also to be searched are vehicles directly associated with the residence, i.e. vehicles parked in the driveway or alley behind the residence or vehicles parked near the residence that are believed to be associated with the residence based on documents or property recovered inside the residence.



## ATTACHMENT B

### The search is related to a violation of:

Title 21 U.S.C. § 841(a)(1) Distribution or Possession with intent to Distribute a Controlled Substance

### Items to Be Searched for and Seized:

#### Drug Distribution Offenses

1.  The following items, images, documents, communications, records, materials, and information are to be seized wherever they may be stored or found at the locations to be searched and in any form that they may be stored or found, associated with the above violations:

    a.  Controlled substances (including prescription drugs);

    b.  United States currency (in excess of $1,000.00), foreign currency, precious metals, jewelry, stocks, bonds, money orders, certificates of deposit and cashier's checks;

    c.  Items evidencing the expenditure of drug-related proceeds, namely: receipts, purchase agreements, vehicle titles, warranty applications, homeowners or renters insurance applications and claims, jewelry;

    d.  Account statements, account summaries, credit card statements, banking deposit slips, handwritten-notes containing account information, account holder and amount deposited, money market accounts, overseas banking information to include routing codes, deposit receipts, canceled checks, loan agreements and loan applications;

    e.  Safe deposit box keys and agreements and commercial storage locker keys or records;

    f.  Drug distribution paraphernalia, namely; scales, baggies, vacuum sealers and vacuum sealer bags, drug ledgers, pay-owe sheets, customer lists,

1

price lists and code sheets,

g. Devices used to communicate with other individuals involved in distributing controlled substances including cellular telephones, satellite telephones, mobile telephones; and devices used to conduct counter-surveillance against law enforcement, such as radio scanners, police radios, surveillance cameras and monitors, anti-bugging devices and devices used to detect the presence of wiretaps, recording devices or transmitters, and/or receipts of literature describing the same. In addition, for agents to answer the telephones and to record and return the pager telephone numbers without identifying themselves as law enforcement officers.

h. Safes, lock boxes, lockers, or any other secured container which contains any of the included items referenced in this attachment establishing evidence of a conspiracy or the use, distribution, transportation, ordering, sale, or receipt of controlled substances.

i. Items involved in packaging and transporting controlled substances, including scales, heat sealing devices, plastic bags, measuring devices, razor blades, and related paraphernalia.

j. Firearms, firearms accessories, and other weapons to include bats and knives, used to protect drug supplies and trafficking proceeds.

**Evidence of Ownership – All Locations**

2. Items tending to establish the identity of the person in control of the SUBJECT PREMISES, and any items seized from the SUBJECT PREMISES, to include utility company receipts, mortgage or rent receipts, canceled mail, envelopes, keys, telephone bills, charge card receipts/statements, lease-rental or sale agreements or contracts, gas receipts, notebooks, photographs, videos, savings account passbooks, passports, diaries, notebooks, vehicle registrations and titles, land titles, escrow papers, legal documents, medical records,

2

weapons with serial numbers, and personal clothing including shoes, pants and shirts.

**Electronically Stored Information ("ESI") to Be Searched**

1.     For searches of any computers or digital devices found at the properties described in Attachment A, law enforcement agents are authorized to search the following ESI subject to the items described in paragraphs above:

A.     Any computer equipment or digital devices that are capable of being used to commit or further the crimes outlined above, or to create, access, or store evidence, contraband, fruits or instrumentalities of such crime described above.

B.     Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crime described above, or to create, access, process, or store evidence, contraband, fruits or instrumentalities of the crime described above.

C.     Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD ROMs, CD Rs, CD RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes outlined above, or to create, access, or store evidence, contraband, fruits or instrumentalities of the crime described above.

D.     Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software.

E.     Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched.

F.     Any physical keys, encryption devices, dongles, or similar physical items which

3

are necessary to gain access to the computer equipment, storage devices, or data.

G.     Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data.

H.     All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) of the computers or digital devices during any time period in which the device was used to commit the crime referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device).

I.     All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device.

J.     All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities of the crime described above.


**Instructions For Searching and Seizing Items in Electronic Storage**


2.     In searching for data capable of being read, stored, or interpreted by a computer or storage device, law enforcement personnel executing the search warrant will employ the

4

following procedure:

A.     On site search, if practicable.  Law enforcement officers trained in computer fo-
rensics (hereafter, "computer personnel"), if present, may be able to determine if digi-
tal devices can be searched on site in a reasonable amount of time and without jeop-
ardizing the ability to preserve data on the devices and conduct such a search if
deemed practicable.  Any device searched on site will be seized if it contains any data
falling within the list of items to be seized as set forth in the warrant and in Attach-
ment B.

B.     On site imaging, if practicable.  If a digital device cannot be searched on site as
described above, the computer personnel, if present, will determine whether the device
can be imaged on site in a reasonable amount of time without jeopardizing the ability
to preserve the data and conduct such imaging if deemed practicable.

C.     Seizure of digital devices for off-site imaging and search.  If no computer per-
sonnel are present at the execution of the search warrant, or if they determine that a
digital device cannot be searched or imaged on site in a reasonable amount of time and
without jeopardizing the ability to preserve data, the digital device will be seized and
transported to an appropriate law enforcement laboratory for review.   Any device
searched offsite will be seized if it contains any data falling within the list of items to
be seized as set forth in the warrant and in Attachment B, if it does not contain such
data, it will be returned within ~~120~~ 90 days.

D.    Law enforcement personnel (potentially including, but not necessarily limited
to, computer personnel) will examine the digital device to  determine if it contains any
data that falls within the list of items to be seized as set forth in the warrant and in At-
tachment B.

E.     Law enforcement personnel will use procedures designed to identify items to be
seized under the warrant.  These procedures may include, without limitation, the use of

5

a hash value to exclude normal operating system files that do not need to be searched. In addition, law enforcement personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data falls within the list of items to be seized under the warrant.

F.      If an original digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will: return that original digital device to its owner within ~~a reasonable period of time~~ 90 days if it can be lawfully possessed; seal any image previously made of the device; and not review the sealed image absent further authorization from the Court.

SEALED COPY

ISSUED

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Eastern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>3515 W Dakota Avenue, Unit #4133, Fresno, California 93722 | )<br>)<br>)<br>)<br>)<br>) |

Case No.   **1: 1 8 SW   0 0 2 0 0 SKO**

## SEARCH AND SEIZURE WARRANT

To:   Any authorized law enforcement officer

    An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the     **Eastern**     District of     **California**
*(identify the person or describe the property to be searched and give its location)*:

    See Attachment A-2, attached hereto and incorporated herein.

    I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

    See Attachment B, attached hereto and incorporated herein.

    **YOU ARE COMMANDED** to execute this warrant on or before              *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

    Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

    The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     **Duty Magistrate**
                                                    *(United States Magistrate Judge)*

    ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
    ☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:    *May 17, 2018 at 4:01 p.m.*      *Sheila K. Oberto*
                                                                                *Judge's signature*

City and state:      Fresno, California                      Hon. Sheila K. Oberto, U.S. Magistrate Judge
                                                                                *Printed name and title*

## **ATTACHMENT A-2**

3515 W Dakota Avenue, Unit #4133, Fresno, California 93722

3515 W Dakota Avenue, Unit #4133, Fresno, CA is described as storage unit inside of Dakota Park & RV Storage is located on the southwest corner of the intersection of Dakota Avenue and Valentine Avenue in Fresno, California. The main entrance to Dakota Park & RV Storage is off N Valentine Avenue in Fresno, California. Unit #4133 has the numbers "4133" in white writing affixed to a black sign on top of the brown colored door.

Also to be searched are all rooms therein, including any safes, storage containers, closets, sheds, and garages associated with the premises.



**ATTACHMENT B**

**The search is related to a violation of:**

Title 21 U.S.C. § 841(a)(1) Distribution or Possession with intent to Distribute a Controlled Substance

**Items to Be Searched for and Seized:**

**Drug Distribution Offenses**

1.   The following items, images, documents, communications, records, materials, and in-formation are to be seized wherever they may be stored or found at the locations to be searched and in any form that they may be stored or found, associated with the above vio-lations:

     a.   Controlled substances (including prescription drugs);

     b.   United States currency (in excess of $1,000.00), foreign currency, precious metals, jewelry, stocks, bonds, money orders, certificates of deposit and cashier's checks;

     c.   Items evidencing the expenditure of drug-related proceeds, namely: re-ceipts, purchase agreements, vehicle titles, warranty applications, home-owners or renters insurance applications and claims, jewelry;

     d.   Account statements, account summaries, credit card statements, banking deposit slips, handwritten-notes containing account information, account holder and amount deposited, money market accounts, overseas banking information to include routing codes, deposit receipts, canceled checks, loan agreements and loan applications;

     e.   Safe deposit box keys and agreements and commercial storage locker keys or records;

     f.   Drug distribution paraphernalia, namely; scales, baggies, vacuum sealers and vacuum sealer bags, drug ledgers, pay-owe sheets, customer lists,

price lists and code sheets,

g.   Devices used to communicate with other individuals involved in distrib-
uting controlled substances including cellular telephones, satellite tele-
phones, mobile telephones; and devices used to conduct counter-
surveillance against law enforcement, such as radio scanners, police radi-
os, surveillance cameras and monitors, anti-bugging devices and devices
used to detect the presence of wiretaps, recording devices or transmitters,
and/or receipts of literature describing the same.  In addition, for agents to
answer the telephones and to record and return the pager telephone num-
bers without identifying themselves as law enforcement officers.

h.   Safes, lock boxes, lockers, or any other secured container which contains
any of the included items referenced in this attachment establishing evi-
dence of a conspiracy or the use, distribution, transportation, ordering,
sale, or receipt of controlled substances.

i.   Items involved in packaging and transporting controlled substances, in-
cluding scales, heat sealing devices, plastic bags, measuring devices, razor
blades, and related paraphernalia.

j.   Firearms, firearms accessories, and other weapons to include bats and
knives, used to protect drug supplies and trafficking proceeds.

**Evidence of Ownership – All Locations**

2.  Items tending to establish the identity of the person in control of the SUBJECT PREMIS-
ES, and any items seized from the SUBJECT PREMISES, to include utility company re-
ceipts, mortgage or rent receipts, canceled  mail, envelopes, keys, telephone bills, charge
card receipts/statements, lease-rental or sale agreements or contracts, gas receipts, note-
books, photographs, videos, savings account passbooks, passports, diaries, notebooks, ve-
hicle registrations and titles, land titles, escrow papers, legal documents, medical records,

2

weapons with serial numbers, and personal clothing including shoes, pants and shirts.

**Electronically Stored Information ("ESI") to Be Searched**

1.      For searches of any computers or digital devices found at the properties described in Attachment A, law enforcement agents are authorized to search the following ESI subject to the items described in paragraphs above:

A.      Any computer equipment or digital devices that are capable of being used to commit or further the crimes outlined above, or to create, access, or store evidence, contraband, fruits or instrumentalities of such crime described above.

B.      Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crime described above, or to create, access, process, or store evidence, contraband, fruits or instrumentalities of the crime described above.

C.      Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD ROMs, CD Rs, CD RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes outlined above, or to create, access, or store evidence, contraband, fruits or instrumentalities of the crime described above.

D.      Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software.

E.      Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched.

F.      Any physical keys, encryption devices, dongles, or similar physical items which

3

are necessary to gain access to the computer equipment, storage devices, or data.

G.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data.

H.    All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) of the computers or digital devices during any time period in which the device was used to commit the crime referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device).

I.    All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device.

J.    All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence, contraband, fruits, or instrumentalities of the crime described above.

## Instructions For Searching and Seizing Items in Electronic Storage

2.    In searching for data capable of being read, stored, or interpreted by a computer or storage device, law enforcement personnel executing the search warrant will employ the

following procedure:

A.     On site search, if practicable.  Law enforcement officers trained in computer fo-
rensics (hereafter, "computer personnel"), if present, may be able to determine if digi-
tal devices can be searched on site in a reasonable amount of time and without jeop-
ardizing the ability to preserve data on the devices and conduct such a search if
deemed practicable.  Any device searched on site will be seized if it contains any data
falling within the list of items to be seized as set forth in the warrant and in Attach-
ment B.

B.     On site imaging, if practicable.  If a digital device cannot be searched on site as
described above, the computer personnel, if present, will determine whether the device
can be imaged on site in a reasonable amount of time without jeopardizing the ability
to preserve the data and conduct such imaging if deemed practicable.

C.     Seizure of digital devices for off-site imaging and search.  If no computer per-
sonnel are present at the execution of the search warrant, or if they determine that a
digital device cannot be searched or imaged on site in a reasonable amount of time and
without jeopardizing the ability to preserve data, the digital device will be seized and
transported to an appropriate law enforcement laboratory for review.  Any device
searched offsite will be seized if it contains any data falling within the list of items to
be seized as set forth in the warrant and in Attachment B, if it does not contain such
data, it will be returned within 1̶2̶0̶ 90 (JLo) days.

D.     Law enforcement personnel (potentially including, but not necessarily limited
to, computer personnel) will examine the digital device to  determine if it contains any
data that falls within the list of items to be seized as set forth in the warrant and in At-
tachment B.

E.     Law enforcement personnel will use procedures designed to identify items to be
seized under the warrant.  These procedures may include, without limitation, the use of

5

a hash value to exclude normal operating system files that do not need to be searched. In addition, law enforcement personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data falls within the list of items to be seized under the warrant.

F.     If an original digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will: return that original digital device to its owner within a reasonable period of time if it can be lawfully possessed; seal any image previously made of the device; and not review the sealed image absent further authorization from the Court.